(No. 20835.— )

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* DAVID FARRELL *et al.* Plaintiffs in Error.

*Opinion filed October 23, 1931.*

R. D. ROBINSON, and L. FRED O'BRIEN, for plaintiffs in error.

OSCAR E. CARLSTROM, Attorney General, R. C. RICE, State's Attorney, and MERRILL F. WEHMHOFF, (ADDISON J. BOUTELLE, and ROY M. MARSH, of counsel,) for the People.

Mr. COMMISSIONER PARTLOW reported this opinion:

The plaintiffs in error, David Farrell and Helen Carr, alias Helen Lewis, were found guilty by a jury, in the circuit court of Knox county, upon an indictment charging extortion by threats, and a writ of error has been prosecuted from this court to review the judgment.

The principal witness for the People was Dennis E. Sullivan, at whose instance the indictment was returned. He was about sixty-six years of age and resided with his wife in Galesburg, a few doors from the residence of Farrell. He and Farrell were locomotive engineers on the Chicago, Burlington and Quincy railroad. The family of Farrell consisted of himself, his wife and Helen Carr, who was a niece of Mrs. Farrell and who had lived with them for

a number of years. At the time of the alleged extortion Mrs. Farrell was in New York and had been there for several months. Farrell was about forty-six years old. Miss Carr was about twenty-eight years old and was a justice of the peace in Galesburg. According to the testimony of Sullivan, on the morning of September 8, 1927, he left his home about 8:10 to go to the round-house to take his train for Quincy. He went to a street intersection to catch a street car and was met by Miss Carr, who was in an automobile. She invited him to ride with her to his place of work. He got into her car and noticed that she had been crying. She told him that Farrell had abused her the night before; that he had pulled her out of bed by the hair of her head and made improper proposals to her; that she was afraid to live with him any longer; that she wanted to talk with Sullivan that morning to see if he would loan her sufficient money to get out of town; that if she could get enough money to leave Galesburg she would close her office and go to Chicago to work. She said that Farrell that morning had gone to New York. Sullivan replied that the time was too short to discuss the matter and that he would see her the next morning when he was off duty. She said she did not want to wait until the next day and asked him to call her when he came home that night. He told her that if he got in on time he would call her, and she said she would be waiting for him. He returned from his run about midnight that night. He called Miss Carr by phone, and she answered that she was waiting for him. He took a taxicab to the Farrell house and was met at the door by Miss Carr. The house was fully lighted and she was apparently alone. He entered the living room and she invited him into the next room. She asked to be excused and went into another room but soon returned, wearing a kimono. He asked her what she had to say, and they began to talk about the money question. In a short time Farrell came rushing into the room with a large knife in

his hand. He addressed Sullivan in vile language and told him that he would have to sign a note payable to Miss Carr for $25,000. Farrell led Sullivan into another room, where there was a blank judgment note and a pen and ink. Farrell said, "Sign this note or you don't get out alive." Sullivan testified that Farrell stood behind him with the knife raised, and that, following the directions of Farrell, he wrote the note and signed it. It is admitted that all of the written part of the note is in the handwriting of Sullivan. It is dated September 9, 1927, is for $25,000 and is payable on demand to Helen Carr, but her name is spelled "Hellen Carr." After Sullivan had drawn and signed the note Farrell placed a piece of blank paper in front of him and said, "Write on this paper that this note was given without any threats or coercion, and sign it." Sullivan then wrote on the paper, "I have made this check without protest," and signed his name. The word "check" was used instead of "note." Miss Carr picked up the note and other paper and Sullivan left the house. Sullivan further testified that the following afternoon Farrell came to his house and told him that he had been too hasty the night before; that he was sorry, and that as far as the note was concerned he need not worry, as the note had been destroyed; that Sullivan never knew that the note was still in existence until 1929, when Miss Carr put the note in judgment in Chicago and caused him to be served with an execution, whereupon he immediately made complaint and plaintiffs in error were indicted.

Farrell denied Sullivan's story in every respect. He testified that he had not mistreated Helen Carr; that he was at home on the night of September 8, 1927; that Sullivan did not come to his house that night; that he (Farrell) had nothing to do with the execution of the note and did not go to the home of Sullivan on the afternoon of September 9. Seventeen witnesses testified to the good general reputation of Farrell.

Helen Carr denied that she took Sullivan in her car to the round-house and related her story to him, or that he was at Farrell's house on the night of September 8, or that the note had been executed in the manner described by him. She testified that he visited her office frequently during 1927 and urged her to give up her job and get a more refined position. She told him she had a great deal of responsibility; that she had a mother and two brothers to support; that she would have to know just what she was going to do before giving up her present work; that she was making about $3000 a year, and that before she would give up the position she would have to be assured that her new work would pay her at least an equal amount. She testified that she and Sullivan figured that her present job was good for eight years, including a re-election, which she could reasonably expect; that out of her present job she could make at least $25,000; that on September 9, 1927, Sullivan at her office assured her that he would take care of her financially if she gave up her position and as evidence of his intention to do so gave her a demand note for $25,000, which he executed in her presence on that day. She testified that after the note was signed she closed her office that same day and began making inquiries as to business opportunities in Chicago; that Sullivan thought she should open a tea room but she concluded she would rather manage an apartment hotel, and that she and Sullivan frequently discussed various possibilities. On October 3 she and Sullivan went to Chicago and interviewed a real estate agent, who showed them three apartment buildings which were for sale, ranging in price from $25,000 to $28,000. Sullivan told the real estate agent that he wanted Miss Carr to get a position of responsibility; that she was a marvelous child, very intelligent, and would make a success of anything she attempted. This part of the story of Miss Carr is corroborated by the real estate agent to whom Sullivan talked. Sullivan and Miss Carr returned to Galesburg the same

evening, and at his suggestion they decided to go to Quincy and investigate the possibilities of opening a tea room there. Early in November she was a passenger on the train on which Sullivan was the engineer and they went to Quincy and made some investigation there. This part of her story is also corroborated by other witnesses. She further testified that she again desired to go to Chicago and asked Sullivan to accompany her. He replied that he did not have time but that she could go to Chicago and look around and when she had a proposition he would look into it. She then went to Chicago and investigated a chain of restaurants. She needed a down payment of $1500 and so reported to Sullivan. He offered to get the money for her. She said she was afraid she might have difficulty in cashing a check because she was not known in Chicago. He said he would take care of that. He went to the bank in Galesburg and got a cashier's check for $1500, which he placed in an envelope and handed to her. When she opened the envelope on the train on her way back to Chicago she found the cashier's check for $1500 payable to Sullivan and endorsed by him to her, and she found also a piece of paper bearing his signature which stated, "I have made this check without protest." She testified that this $1500 check was in part payment of the $25,000 note, and when judgment was entered on the note it was for only $23,500.

In rebuttal Sullivan admitted that he had accompanied Helen Carr to Chicago and Quincy; that he went with her to aid her in getting a position; that prior to these trips, and subsequent to the alleged extortion, she had told him that Farrell had demanded the $25,000 note of her and had destroyed it. He testified that on November 28, 1927, Farrell came to his house and stated that Miss Carr had an opportunity to go into a log-cabin shop, which would cost $1500, and it was up to Sullivan to furnish the money. Sullivan agreed to see Farrell the following day. On the following day Farrell asked Sullivan whether he was go-

ing to give Miss Carr a chance to make a living, and Farrell threatened to ruin his reputation if he did not give her $1500; that Sullivan agreed to make the payment in order to keep them quiet; that he on November 29, 1927, took Miss Carr to the bank and had the cashier's check made out to his order and he endorsed it and delivered it to her. Farrell denied that he had these interviews with Sullivan or that he had had anything to do with procuring the $1500 check.

This, in substance, is the evidence in the case. Several grounds of reversal are urged, but it will be necessary to consider only one of them, namely, whether or not the evidence is sufficient to sustain the judgment. Where a conviction is based upon unsatisfactory evidence, or where there remains such a grave and serious doubt of the guilt of the accused as to lead to the conclusion that the verdict is the result of prejudice or passion and not of that calm and deliberate consideration of the evidence which the law requires, it is the duty of this court to reverse the judgment. *People* v. *Fitzgibbons*, 343 Ill. 69; *People* v. *Elmore*, 318 id. 276; *People* v. *Wieland*, 313 id. 594.

The only issue with which this court is concerned is whether or not the evidence shows, beyond a reasonable doubt, that the plaintiffs in error were guilty of extortion of the note by threats on September 9, 1927, as alleged in the indictment. Sullivan was the only witness who testified on this point on behalf of the People, and he is corroborated in very few, if any, material details. His story is so contradictory and so improbable that it is difficult to believe it is true. Helen Carr's story is equally improbable, and we are satisfied that the whole truth in this case has not been told. Farrell contradicted Sullivan on almost every material point, and he proved by seventeen witnesses his previous good reputation. The cashier's check, the judgment note and the paper marked defendants' exhibit 3, bearing the writing, "I have made this check without protest," which

paper was signed by Sullivan, were introduced in evidence by plaintiffs in error and have been certified to this court for examination. It is admitted that the note and exhibit 3 are in the handwriting of Sullivan and that they bear his genuine signature. The cashier's check is payable to Sullivan and on the back bears his genuine endorsement making it payable to Helen Carr. In the note and in the endorsement on the back of the check, both of which were written by Sullivan, the name "Helen" is spelled "Hellen." If Sullivan's story is true the note and exhibit 3 were written at the same time and place and with the same pen and ink. If Helen Carr's story is true the endorsement on the check and the writing on exhibit 3 were made at the same time but not necessarily with the same pen and ink. It is evident from an examination of these exhibits that the endorsement on the check and the writing in exhibit 3 were not made with the same pen and ink. Sullivan testified not only that the note and exhibit 3 were written at the same time but also testified that they were written by him under duress, while Farrell was holding a knife over him. There is no evidence in the writing on either of these exhibits of any nervousness on the part of the person who executed them. The writing in each is steady and firm. Sullivan testified that he was ordered to write on the blank piece of paper that the note was given without any threat or coercion. On exhibit 3 the word "note" does not appear but the statement is that the "check" was given without protest. The word "check" more reasonably refers to the $1500 cashier's check than to the judgment note. The check was dated over two months after the note is claimed to have been signed. If they were not written at the same time and with the same pen and ink the story of Sullivan is conclusively disproved.

It is admitted that Sullivan made no protest to the police about this alleged extortion, and it is admitted that within a few weeks after the note was signed he accompanied Helen

Carr to Chicago and Quincy in order to help her decide upon a location for business. Counsel for the People urge that he did not then prefer charges against plaintiffs in error because he was in fear of bodily harm if he did so. Sullivan testified that he was not afraid of the plaintiffs in error or anything they might be able to do to him in the open. It is possible that he might have refrained from prosecuting the plaintiffs in error when he was assured by Farrell the day after the alleged extortion that the note had been destroyed. Even if this were true, it is difficult to understand how he could be on such friendly terms with Miss Carr as he apparently was when they went to Chicago and Quincy. He testified that she told him on the morning of September 8, 1927, that she needed money in order to get away from Galesburg and into a new position. It is improbable that Sullivan would accompany her to help her decide upon the purchase of an apartment building or a tea room, involving the expenditure of a considerable sum of money, when he knew she did not have the money to pay for it. This act of his does not tend to corroborate his story as to the method by which the note was obtained.

The cashier's check for $1500 payable to the order of Sullivan and admittedly endorsed by him to Helen Carr is not satisfactorily explained by Sullivan. According to his story he had the check prepared after Farrell had threatened to start a scandal about him. This is not consistent with his testimony that he was not afraid of plaintiffs in error as long as they were in the open. It is consistent with the statement of Miss Carr that this check was made as part payment of the note.

The evidence shows that Sullivan was worth about $90,000 and was amply able to pay this note. While the plaintiffs in error were interested in the outcome of the case, which involved their personal liberty, Sullivan also had a financial interest in the outcome of the case.

The evidence is not sufficient to establish the guilt of the plaintiffs in error beyond a reasonable doubt, and the judgment is reversed and the cause remanded.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Partlow is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Reversed and remanded.*